**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SCOTT P. COWAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM SCHARFENBERG, *et al.*,<br><br>Defendants. | Civil Action No. 23-09446 (GC) (TJB)<br><br>**OPINION** |

**CASTNER, District Judge**

    **THIS MATTER** comes before the Court upon a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). Defendants William Scharfenberg, Bradley Billhimer, Joseph Coronato, Mark Malinowski, and the Ocean County Prosecutor's Office (collectively, Defendants)[1] filed a joint Motion to Dismiss on February 18, 2025. (ECF No. 45.) Plaintiffs opposed and Defendants replied. (ECF Nos. 46, 50.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motion (ECF No. 45) is **GRANTED in part** and **DENIED in part**.

---

[1]     Beacon Homes is a Defendant in this case but separately answered the Complaint. (ECF No. 13.) Accordingly, all claims against it shall proceed. Any reference to "Defendants" in this Opinion excludes Beacon Homes.

I.    **BACKGROUND**[2]

On August 24, 2023, Plaintiffs Scott Cowan and Jonathan Price, along with their business Price Home Group, LLC (collectively, Plaintiffs) sued various entities and individuals, including William Scharfenberg, Assistant Ocean County Prosecutor and owner of Beacon Homes of New Jersey, LLC; Joseph Coronato[3] and Bradley Billhimer, Ocean County Prosecutors (individually and in their official capacities); Mark Malinowski, a detective in the Ocean County Prosecutor's Office (the OCPO); the OCPO; Prosecutor John Does 1-20 (presently unidentified Assistant Ocean County Prosecutors); and Investigator Richard Roes 1-20 (presently unidentified employees of the OCPO). (*See generally* ECF No. 1.)  Plaintiffs allege that Scharfenberg, in concert with the other Defendants, illegally targeted them over a business rivalry via a criminal investigation and prosecution. (*Id.*)  Plaintiffs bring claims under 42 U.S.C. § 1983 and the Declaratory Judgment Act, as well as state law claims.[4] (*Id.*)

Plaintiffs are the owners and operators of Price Home Group, LLC (PHG), an Ocean County, New Jersey construction business founded in 2013. (*Id.* ¶ 19.)  In the aftermath of Hurricane Sandy, New Jersey established the Reconstruction, Rehabilitation, Elevation, and Mitigation (RREM) program to administer grants to eligible homeowners for repairs. (*Id.* ¶¶ 3, 43.)  Grant recipients were required to contract with construction businesses admitted to the RREM program's qualified pool of builders. (*Id.* ¶¶ 21, 45.)  PHG became one such company, having

---

[2]    On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).

[3]    Defendant Coronato is incorrectly pled as "Joseph Coronado."

[4]    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

been certified by the New Jersey Department of Community Affairs (NJDCA) on June 1, 2013 and subsequently growing into a successful business over the next two years. (*Id.* ¶ 20-21, 45.)

Initially, PHG built homes in the southern portion of Ocean County, largely centered in and around Stafford Township, including areas such as Manahawkin, Ship Bottom, and Little Egg Harbor. (*Id.* ¶ 23.) As the company grew, however, PHG expanded its operations northward into Brick, Toms River, and Seaside Heights. (*Id.* ¶ 24.) There, PHG competed with another RREM-qualified builder, Beacon Homes, for the same prospective customer base: those whose homes were damaged by Hurricane Sandy. (*Id.* ¶ 34.)

Beacon Homes was owned and operated by Scharfenberg, while he was simultaneously serving as an Assistant Ocean County Prosecutor. (*Id.* ¶¶ 32-35.) Plaintiffs contend that Scharfenberg "used Beacon Homes as a weapon in his effort to eliminate PHG as a competitor." (*Id.* ¶ 40.) According to Plaintiffs, Scharfenberg operated Beacon Homes from OCPO premises using OCPO resources, including equipment and staff. (*Id.* ¶ 41.) This conduct created a conflict of interest and violated New Jersey ethics laws. (*See id.* ¶¶ 32-42.) Plaintiffs state that Ocean County Prosecutors Coronato and Billhimer were aware of Scharfenberg's ownership and operation of Beacon Homes, but nevertheless allowed him to proceed with an investigation against Plaintiffs. (*Id.* ¶ 152.) Plaintiffs allege that Scharfenberg failed to obtain permission from the Ocean County Prosecutor to operate Beacon Homes as an Assistant Ocean County Prosecutor "as the law required." (*Id.* ¶ 52.) Ultimately, Plaintiffs contend that Scharfenberg's ownership of Beacon Homes led him to criminally investigate and prosecute Plaintiffs "with the intention of destroying his competitor, PHG." (*Id.* ¶ 4.)

### A.    The Investigation

Plaintiffs allege that, in 2015, Scharfenberg initiated an improper criminal investigation based on information Scharfenberg learned regarding a civil payment dispute between PHG and

its client. (*See id.* ¶¶ 47-51.) According to Plaintiffs, PHG's customer failed to pay the required "draw-down" needed to complete the construction on her home and therefore, "consistent with its contract and the law of New Jersey," Plaintiffs refused to release her house. (*Id.* ¶¶ 48-49.) The customer's son was an ex-Ocean County Sheriff's Office employee who knew Scharfenberg personally and complained to Scharfenberg about his mother's dealings with PHG. (*Id.* ¶ 47.) Based on those complaints, Scharfenberg initiated a criminal investigation into Plaintiffs. (*Id.* ¶ 50.)

Plaintiffs contend that in conducting the criminal investigation, Scharfenberg "misused and abused" the power of his office by both concealing his conflict of interest from others involved in the investigation and personally performing various actions normally left to investigators. (*Id.* ¶ 53.) Specifically, on April 30, 2015, Scharfenberg personally served a subpoena at PHG's accountant's office for Plaintiffs' tax returns and bank statements as well as those of Price and Cowan's wives, and arranged for an IRS agent to be present during the service. (*Id.* ¶¶ 54-55.) Ten days later, on May 10, 2015, Scharfenberg personally interviewed PHG's accountant in the presence of the IRS agent. (*Id.* ¶ 59.) According to Plaintiffs, the IRS thoroughly reviewed all subpoenaed information, including business and personal tax returns, and found no irregularities or unlawful conduct. (*Id.* ¶ 61.)

Using information obtained from the subpoenas, Plaintiffs allege that Scharfenberg and investigators under his direction, including Detective Malinowski, contacted PHG's customers and informed them that the OCPO was investigating PHG for possible criminal violations. (*Id.* ¶¶ 62-63.) Moreover, Plaintiffs allege that Scharfenberg falsely told PHG customers, manufacturers, and suppliers that Plaintiffs had stolen $1 million and wired it to accounts outside of the country. (*Id.* ¶ 56.)

4

Plaintiffs allege that Scharfenberg also directly interfered with their business operations and "effectively dr[ove them] out of business." (*Id.* ¶ 66.) First, Scharfenberg allegedly instructed PHG customers to stop making additional payments to PHG despite their contractual obligations. (*Id.* ¶ 63.) Second, Ritz Craft, PHG's exclusive modular home manufacturer, also suspended construction on all PHG orders, allegedly based on advice they received from Scharfenberg. (*Id.* ¶¶ 57, 65.) Third, NJDCA removed PHG from the RREM program, allegedly based on false information that Scharfenberg provided. (*Id.* ¶ 66.) Specifically, Plaintiffs allege that Scharfenberg informed RREM personnel that he was investigating Plaintiffs for potential misconduct in connection with the program. (*Id.* ¶ 58.) According to Plaintiffs, Scharfenberg had a "direct relationship" with these individuals through Beacon Home's RREM participation. (*Id.*)

## B.    The Bankruptcy Proceedings

On March 1, 2016, "as a direct and proximate result of Scharfenberg's interference with PHG," Price and Cowen each filed for Chapter 11 bankruptcy. (*Id.* ¶ 67.) During the proceedings, Plaintiffs allege that Scharfenberg met with the United States Bankruptcy Trustees. (*Id.* ¶ 68.) In that meeting, Scharfenberg relayed "false and inaccurate information" about Plaintiffs while also concealing the fact that he "owned and operated Beacon Homes and was a competitor of PHG." (*Id.* ¶ 69.) Scharfenberg also asked the Trustees to depose Cowan using questions provided by the OCPO. (*Id.* ¶ 68.) This request, Plaintiffs contend, was an attempt to circumvent attorney-client privilege between Cowan and his criminal attorney.[5] (*Id.*) Plaintiffs allege that Scharfenberg's actions resulted in the conversion of their bankruptcy from a Chapter 11 to a Chapter 7 bankruptcy

---

[5]    Plaintiffs do not specify how this request violated attorney-client privilege.

and seizure of all their assets.[6]  (*Id.* ¶ 70.)  Furthermore, Scharfenberg's interference led the Trustees to successfully "oppose[ ] the discharge of the bankruptcies." (*Id.*)

Plaintiffs allege that Malinowski told a PHG client that PHG, as a business, had filed for bankruptcy.  (*Id.* ¶ 140.)  In fact, Plaintiffs contend, "PHG never filed [for] bankruptcy and continued to complete projects through March 2016." (*Id.*)

### C.    Grand Jury Proceedings and the Indictment

The OCPO presented the case against Plaintiffs to the grand jury on January 6, 2021, which Plaintiffs allege was done under Scharfenberg's direction.  (*Id.* ¶ 74.)  On January 16, 2021, the grand jury returned a 31-count Indictment charging PHG, Price, and Cowan with conspiracy and fraud.  (*Id.* ¶ 75.)  As detailed below, Plaintiffs allege that Defendants failed to present multiple sources of exculpatory evidence.

#### 1.    Evidence Regarding Laura Matarazzo

In Counts 1 and 6 of the Indictment, the grand jury charged Plaintiffs with defrauding Laura Matarazzo, a PHG customer, regarding her home in Lavallette/Toms River.  (*Id.* ¶ 76.)  However, Plaintiffs contend that the OCPO knowingly concealed material exculpatory information from the grand jury regarding Matarazzo.  (*Id.* ¶ 77.)

This concealed information allegedly included three key facts that undermined Matarazzo's credibility.  First, the OCPO allegedly concealed that it had itself charged Matarazzo with RREM fraud.  (*Id.*)  Second, Matarazzo had also been charged by New Jersey's Division of Criminal Justice for defrauding the Federal Emergency Management Agency (FEMA).  (*Id.*)  Third, the

---

[6]    Chapter 11 and Chapter 7 bankruptcies have different legal consequences.  In a Chapter 11 bankruptcy, debtors and creditors negotiate a plan to allow a debtor to repay creditors while continuing to operate their business. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017). In a Chapter 7 bankruptcy, a debtor's assets are liquidated and distributed to creditors. *Id.*

OCPO allegedly failed to disclose that Matarazzo still owed PHG $50,000—a debt that Plaintiffs contend gave Matarazzo a motive to lie and rendered her testimony biased. (*Id.*) Plaintiffs argue that suppressing this information from the grand jury deprived them of a "fundamentally fair jury presentation and due process." (*Id.* ¶ 78.)

### 2. False Contract Amounts

In Count 3 of the Indictment, Plaintiffs allege that the OCPO knowingly misrepresented contract amounts to inflate the degree of criminal penalties and restitution obligations. (*Id.* ¶ 80.) Specifically, the OCPO told the grand jury that PHG's contract with two of its customers, Joanne and Steven Gwin, was worth significantly less than its actual value. (*Id.* ¶ 82.) By falsely understating the contract price, the OCPO manufactured inflated losses of $193,364. (*Id.* ¶ 83.) In reality, Plaintiffs state that the Gwins' actual losses were approximately $6,000.[7] (*Id.* ¶ 84.) Plaintiffs allege that the OCPO's use of the false number allowed them to upgrade the charge against Plaintiffs from a low-level third-degree offense (with a five-year maximum jail sentence) to a second-degree offense (with a ten-year jail sentence). (*Id.* ¶ 86.)

### 3. Violation of Attorney-Client Privilege

Plaintiffs also allege that the OCPO improperly reviewed, relied upon, and presented the grand jury with communications subject to attorney-client privilege. Jeremy Price acted as counsel for PHG and for Plaintiffs individually. (*Id.* ¶¶ 88-89.) Plaintiffs allege that Scharfenberg personally interviewed Jeremy Price in the presence of Jeremy Price's attorney, Dean Gresek,

---

[7]    Specifically, Plaintiffs allege that the OCPO told the grand jury that PHG's contract with the Gwins was worth only $246,636 when the OCPO knew the actual contract price was $434,173. (ECF No. 1 ¶ 81.) The Gwins ultimately paid $440,000 for work PHG performed on their home. (*Id.* ¶ 84.) By falsely understating the contract value, the OCPO could then claim that when the Gwins paid $440,000, they had suffered losses of $193,364 ($440,000 minus the false $246,636 figure). (*Id.* ¶ 83.) In reality, the Gwins' actual losses were approximately $6,000—the difference between what they paid ($440,000) and what Plaintiffs allege was the true contract price ($434,173). (*Id.* ¶ 84.)

about his involvement with PHG. (*Id.* ¶ 90.) The OCPO then withheld the transcript and audio of that interview from criminal discovery to prevent Plaintiffs from learning of the alleged privilege violation. (*Id.* ¶ 91.) Beyond this, Plaintiffs allege that the OCPO collected, reviewed, relied on, and presented to the grand jury information subject to attorney-client privilege including emails, affidavits, billing records, and letters. (*Id.* ¶¶ 92-94.) Plaintiffs state that there is no evidence that the OCPO employed a filter team to protect against privilege violations. (*Id.* ¶¶ 96-97.)

### 4.      Mischaracterization of Evidence

Plaintiffs state that the OCPO materially misrepresented evidence regarding PHG's accountants, telling the grand jury that PHG had fired their accountants after they expressed "concerns with the financial position of the company." (*Id.* ¶¶ 98-100.) Plaintiffs allege that, in fact, the available evidence showed that PHG fired these accountants because they were unqualified and made numerous mistakes. (*Id.* ¶¶ 101-105.)

### 5.      Inclusion of Non-Victims in the Indictment

Plaintiffs allege that the OCPO improperly included numerous customers in the Indictment who were not actually victims to "create the appearance of massive fraud." (*Id.* ¶ 107.) For example, while the OCPO included Laura Matarazzo in the Indictment as a victim, Plaintiffs assert that she was "[n]ot a [v]ictim: [s]he was a [c]riminal" only interested in defusing her own criminal liability. (*Id.* ¶¶ 109-115.) Plaintiffs allege that seven other individuals were named as victims spuriously. (*See id.* ¶¶ 116-147.) These victims, Plaintiffs contend, either received full reimbursements from RREM, obtained refunds exceeding their payments to PHG, or saved money by completing their homes with other builders. (*Id.*) In several cases, Plaintiffs contend, the NJDCA determined that PHG had provided work that exceeded the customers' payments. (*See id.* ¶¶ 138-147.) Therefore, these individuals were not entitled to compensation from PHG. (*See id.* ¶¶ 138-148.)

### D.    Damages

As a result of Defendants' alleged conduct, Plaintiffs assert they incurred substantial damages including legal fees of approximately $300,000 for Cowan and $214,000 for Price. (*Id.* ¶ 159.)  Plaintiffs also contend that Defendants' actions resulted in the destruction of PHG and a loss of their livelihood. (*Id.*)  Plaintiffs state they were each forced into a $500,000 settlement with NJDCA, which also resulted in the permanent loss of their contractor and builder licenses. (*Id.*)  Additionally, Plaintiffs allege that they suffered damage to their reputations and were forced into bankruptcy. (*Id.*)

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1): Lack of Subject Matter Jurisdiction

Under Rule 12(b)(1), a defendant may move at any time to dismiss the Complaint for lack of subject matter jurisdiction on either facial or factual grounds. *Gould Electr. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff." *Gould Electr. Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. March 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff

will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268.

Rule 12(b)(1) "provides for the dismissal of a proceeding for lack of subject-matter jurisdiction . . . including lack of jurisdiction due to Eleventh Amendment immunity." *Nemeth v. Off. of the Clerk of the N.J. Superior Ct*, Civ. 19-16809, 2020 WL 2537754, at *2 (D.N.J. May 19, 2020). State sovereign immunity under the Eleventh Amendment "is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Wright v. N.J. Dep't of Educ.*, 115 F. Supp. 3d 490, 494 (D.N.J. 2015). Once a challenge to jurisdiction is raised under Rule 12(b)(1), the plaintiff bears the burden of demonstrating the existence of subject-matter jurisdiction. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006).

**B.     Rule 12(b)(6): Failure to State a Claim**

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dir. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere

conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis* v. Wells Fargo, 824 F.3d 333, 349 (3d Cir. 2016).

## III.    DISCUSSION

Defendants raise numerous grounds for dismissing the claims against them. *First*, the Eleventh Amendment bars Plaintiffs' claims. *Second*, Defendants are not "persons" amenable to suit under § 1983. *Third*, absolute and qualified immunity bars Plaintiffs' civil rights claims under § 1983. *Fourth*, Plaintiffs' § 1983 claim is barred pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). *Fifth*, the New Jersey Tort Claims Act (NJTCA) bars the state law claims. *Sixth*, Defendants argue that PHG, as a defunct entity, lacks standing and should be dismissed from this case. The Court will address each argument in turn.

### A.    Eleventh Amendment Sovereign Immunity

Defendants move to dismiss the Complaint based on Eleventh Amendment sovereign immunity. (ECF No. 45-2 at 27.)[8] The Eleventh Amendment protects non-consenting states from suits brought in federal court by private citizens seeking money damages. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Sovereign immunity applies to state agencies and their employees as long as the state is the "real party in interest." *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989).

---

[8]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

In *Fitchik,* the Third Circuit laid out a three-factor test for sovereign immunity: (1) "[w]hether the money that would pay the judgment would come from the state," (2) "[t]he status of the agency under state law," and (3) "[w]hat degree of autonomy the agency has." *Id.* at 659. "*Fitchik* provides the proper framework for analyzing Eleventh Amendment sovereign immunity as it applies to county prosecutors." *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.,* 769 F.3d 850, 857–58 (3d Cir. 2014).

"When county prosecutors and their subordinates are involved in the investigation and enforcement of the State's criminal laws, they perform a function that has traditionally been the responsibility of the State." *Wright v. State,* 778 A.2d 443, 464 (N.J. 2001). Indeed, "[c]ourts within the Third Circuit have consistently held that the Eleventh Amendment precludes federal suits against New Jersey county prosecutors, as well as their offices, arising out of their law enforcement functions on the basis that the real party in interest in these suits is the State of New Jersey." *Duncan v. Office of Passaic Cnty. Prosecutor,* Civ. No. 05-1931, 2012 WL 1079471, at *2 (D.N.J. Mar. 30, 2012); *see also Beightler v. Office of Essex Cnty. Prosecutor,* 342 Fed. App'x 829, 832 (3d Cir. 2009) (holding that the Essex County Prosecutor's Office "was acting as an arm of the state and entitled to immunity under the Eleventh Amendment" when its prosecutors were performing law enforcement and investigative functions); *Hyatt v. County of Passaic,* 340 F. App'x 833, 837 (3d Cir. 2009) (finding that county prosecutor's office was entitled to sovereign immunity because defendants were acting in a prosecutorial function which is not autonomous from the state). "Decisions such as whether to bring charges are clearly within the 'law enforcement function[s] . . . that the Legislature has delegated to the county prosecutors.'" *Rouse v. N.J. Dep't of Health & Hum. Servs.,* Civ. 15-01511, 2015 WL 5996324, at *3 (D.N.J. Oct. 13, 2015) (quoting *Wright,* 778 A.2d at 462).

Here, because Defendants' alleged misconduct involved the state function of investigation and the enforcement of the criminal laws, Defendants are considered arms of the state, and the State is therefore responsible for any judgment against them under *Fitchik*'s first factor. *Wright*, 169 N.J. at 462–463 (stating that when "county prosecutors and their subordinates act in their law enforcement/investigatory capacity, they act as agents and officers of the State. . . . When their conduct in that context is actionable, the State should be made to respond to damages"). This designation applies not only to the OCPO, but also to all of its employees including Coronato, Billhimer, Scharfenberg, and Malinowski when sued in their official capacity. *See Evans v. City of Newark*, Civ. No. 14-00120, 2016 WL 2742862, at *11 (D.N.J. May 10, 2016) (finding all Essex County Prosecutor Office (ECPO) defendants—including investigators and detectives employed by the ECPO—to be acting as "arms of the state").

Second, the Court must look to the status of the agency under state law, *i.e.* whether "state law treats an agency as independent, or as a surrogate for the state." *Fitchik*, 873 F.2d at 662. County prosecutors are "appointed by the Governor with the advice and consent of the [State] Senate" under the New Jersey Constitution. N.J. Const. art. VII, § 2, ¶ 1. OCPO's designation as a "constitutionally established office" satisfies the second *Fitchik* factor. *Rouse*, 2015 WL 5996324, at *3 (holding that the Hudson County Prosecutor's Office, as a "constitutionally established office," satisfied the second *Fitchik* factor).

Finally, the Court considers Defendants' degree of autonomy from the state. New Jersey law dictates that "the criminal business of the State" is "prosecuted by the Attorney General and the county prosecutors." N.J. Stat. Ann. § 2A:158-4. The New Jersey Attorney General may intervene or take over any case that county prosecutors initiate. N.J. Stat. Ann. § 52:17B-106; *see also Murphy v. Middlesex Cnty.*, Civ. No. 15-7102, 2017 WL 6342154, at *6 (D.N.J. Dec. 12,

13

2017) (finding under the third *Fitchik* factor that "County Prosecutor's offices and their employees are subject to supervision and supersession by the Attorney General when engaged in the criminal business of the State" (internal quotation marks omitted)); *Hof v. Janci*, Civ. No. 17-295, 2017 WL 3923296, at *4 (D.N.J. Sept. 7, 2017) (concluding that the Hudson County Prosecutor's Office was not autonomous because the office and its employees are "subject to supervision and supersession by the Attorney General"). Accordingly, the OCPO and its employees are not an autonomous entity when performing prosecutorial functions such as investigating, arresting, or prosecuting Plaintiffs.

Here, based upon the application of the *Fitchik* factors, the Court finds that the OCPO is an "arm of the state" and sovereign immunity bars any claim for damages against the OCPO, Billhimer, Coronato, Scharfenberg and Malinowski in their official capacities. *Kaul v. Christie*, 372 F. Supp. 3d 206, 243 (D.N.J. 2019); *Estate of Bardzell v. Gomperts*, 515 F. Supp. 3d 256, 267 n.6 (D.N.J. 2021) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is not different from a suit against the state itself.") (quoting *Allen v. N.J. State Police*, 974 F.3d 497, 506 (3d Cir. 2020)).

The doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), dictates that a plaintiff may bring a suit against state agencies and officials—notwithstanding the Eleventh Amendment's jurisdictional bar—when the plaintiff seeks prospective injunctive relief to end a continuing violation of federal law. *Delaware River Joint Toll Bridge Comm'n v. Sec'y Pa. Dep't of Lab. & Indus.*, 985 F.3d 189, 193 (3d Cir. 2021).[9] This exception "requires [the Court] to 'conduct a

---

[9]    There are two other exceptions to Eleventh Amendment immunity, neither of which apply here. Plaintiffs do not argue that Congress has abrogated the Eleventh Amendment in this context. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996) (finding that Congress may abrogate Eleventh Amendment immunity if it has "unequivocally expresse[d] its intent to" do so and acted "pursuant to a valid exercise of power"); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ.*

straightforward inquiry into whether the complaint alleges an ongoing violation of federal law' and whether it 'seeks relief properly characterized as prospective.'" *Id.* at 193–94 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiffs' Complaint solely concerns past violations of state and federal law. Plaintiffs make no allegation of "an ongoing violation of federal law [nor] seek[ ] relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 645 (citations omitted). Instead, Plaintiffs insert a passing request for injunctive relief to "prohibit[] [D]efendants from continuing any violations against [P]laintiffs." (ECF No. 1 ¶ 159.) Plaintiffs do not explain the nature of the "violations" from which they seek relief and fail to allege specific facts that would allow the Court to infer that these "violations" are ongoing. *See Suring v. South River Bd. of Educ.*, Civ. No. 20-2804, 2022 WL 264464, at *3 (3d Cir. Jan. 27, 2022) (holding that *Ex Parte Young* exception did not apply when the plaintiff failed to include facts indicating that constitutional violations were ongoing); *Taylor v. City of Jersey City*, Civ. No. 22-457, 2023 WL 6997250, at *4 (D.N.J. Oct. 24, 2023) (dismissing claims as barred by the Eleventh Amendment where the plaintiff failed to allege specific facts from which the court might infer that the alleged civil rights violations were ongoing).

In sum, all claims against the OCPO, Billhimer, Coronato, Scharfenberg, and Malinowski in their official capacities are dismissed without prejudice. The Court next addresses Defendants'

---

*Expense Bd.*, 527 U.S. 666, 670 (1999) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)). Nor is there any indication that the State waived sovereign immunity. *Coll. Sav. Bank*, 527 U.S. at 670 (*citing Clark v. Barnard*, 108 U.S. 436 (1883)).

arguments regarding Plaintiffs' claims against Defendants in their individual capacities.[10]  *Hafer v. Melo*, 502 U.S. 21, 31 (1991).

### B.    Count I: Section 1983 Claims

Under Count I, Plaintiffs allege that Defendants, "individually, jointly and severally and through a conspiracy," have deprived Plaintiffs of their "rights to due process, the presumption of innocence, [and] the right to counsel and fundamental fairness under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution." (ECF No. 1 ¶ 157.)  They claim that their damages include the following: "[b]eing wrongfully investigated and prosecuted, requiring them to incur legal fees"; "[d]eprivation of their rights to the presumption of innocence, due process and fundamental fairness"; "[d]estruction of [Plaintiffs'] right to earn a[ ] livelihood"; "[d]amage to their reputations"; and "being forced into bankruptcy." (*Id.* ¶ 159.)

Based on these allegations, the Court construes Count I as asserting a malicious prosecution claim under the Fourth Amendment and a Fourteenth Amendment claim for deprivation of Plaintiffs' liberty and property interests in their business without due process of law.[11]  In their Motion to Dismiss and reply brief, Defendants only challenge the malicious prosecution claim

---

[10]    Although the Complaint is either silent or unclear regarding individual claims against certain Defendants, the Court construes Plaintiffs' claims as being asserted against Coronato, Billhimer, Scharfenberg, and Malinowski in their individual capacities. *Atwell v. Schweiker,* 274 F. App'x 116, 118 (3d Cir. 2007) (citing *Melo v. Hafer*, 912 F.2d 628, 636 (3d Cir. 1990), *aff'd*, 502 U.S. 21 (1991)); *Gregory v. Chehi*, 843 F.2d 111, 119–20 (3d Cir. 1988).

[11]    Plaintiffs also appear to assert a Fourteenth Amendment reckless investigation claim.  To the extent that such a claim is asserted, the Court will not address it here given that the Third Circuit has not affirmatively recognized an independent cause of action for failing to conduct a constitutionally adequate investigation. *Geness v. Cox*, 902 F.3d 344, 349 n.5 (3d Cir. 2018) (noting that a Fourteenth Amendment reckless investigation claim, "if cognizable, could only arise under the Fourth Amendment." (citing *Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (observing that "[a] plaintiff cannot state a due process claim by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment" (citations omitted)).

asserted under Count I. (*See* ECF Nos. 45-2 at 36-40; 50 at 16-17.) Accordingly, the Court will

address Count I only with respect to the malicious prosecution claim.[12]  *See Millner v. Bayada*

*Nurses, Inc.*, Civ. No. 05-3164, 2006 WL 231993, at *2 (D.N.J. Jan. 30, 2016) (stating that the

court "is under no obligation to raise legal arguments overlooked or ignored by the parties") (citing

*Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 441 (1990) (Marshall, J., dissenting) ("The

courts' general refusal to consider arguments not raised by the parties, for example, is founded in

part on the need to ensure that each party has fair notice of the arguments to which he must

respond.") and *Farnham v. Windle*, 918 F.2d 47, 51 (7th Cir.1990) (failure to raise legal argument

in opposition to motion to dismiss results in waiver)).

---

[12]     In their opposition brief, Plaintiffs argue that "[i]n an effort to recast [P]laintiffs' Complaint, [D]efendants characterize this case simply as one of 'malicious prosecution.'" (ECF No. 46 at 38.) The Court agrees that the allegations in the Complaint suggest Plaintiffs have pled multiple claims under § 1983 beyond malicious prosecution. Specifically, the Complaint contains allegations that Scharfenberg and Malinowski interfered with Plaintiffs' business, including certain contractual obligations. (*See* ECF No. 1 ¶¶ 57, 63 (alleging that Scharfenberg instructed Ritz Craft to stop accepting orders from PHG and that Scharfenberg and Malinowski instructed PHG customers not to make payments they were contractually obligated to make).) While Plaintiffs fail to specify the constitutional right that such conduct violates, the Court construes the allegations as claiming that Defendants' conduct deprived Plaintiffs of their liberty and property interests in their business without due process of law. *See Thomas v. Indep. Twp.*, 463 F.3d 285, 297 (3d Cir. 2006) (stating that allegations regarding the defendants' "campaign of defamation, harassment, and intimidation" against the plaintiffs' business were sufficient to plead a deprivation of the plaintiffs' Fourteenth Amendment liberty and property interests in their business without due process of law); *see also San Jacinto Savings & Loan v. Kacal*, 928 F.2d 697, 704 (5th Cir.1991) (reversing the district court's grant of summary judgment and allowing plaintiff's § 1983 due process claim to proceed where evidence showed police officers' harassment of plaintiff and her customers directly caused such substantial business losses that plaintiff was compelled to close her business and default on her lease). Therefore, the Court will allow Count I to survive to the extent it is premised on allegations unrelated to Scharfenberg's initiation and pursuit of the criminal proceedings against Plaintiffs (which, as discussed below, is barred under the doctrine of absolute immunity). Should Plaintiffs seek to amend their Complaint, however, the Court instructs them to plead each § 1983 claim as a separate count. Plaintiffs must specify which constitutional right is being violated and set forth specific factual allegations supporting each element of the claim.

Furthermore, while Plaintiffs invoke the Fifth and Sixth Amendments, there are no allegations that could sustain a claim brought under those constitutional provisions. *See Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983) (Fifth Amendment's due process clause only restricts the actions of federal officials, not state actors); *see generally Edwards v. Arizona*, 451 U.S. 477 (1991) (articulating the contours of a Fifth Amendment right to counsel during custodial interrogations); *Rothgery v. Gillespie Cnty., Tex.,* 554 U.S. 191, 198 (2008) (holding that the Sixth Amendment right to counsel attaches upon "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment").

### 1.    "Persons" Under § 1983 and Amenability to Suit

Defendants argue that they are not "persons" under § 1983 and are not amenable to suit. (*See* ECF No. 45-2 at 43.) Section 1983 imposes liability on "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). Defendants deemed not to be "persons" are immune from suit.

Individuals that are "arms of the state" for Eleventh Amendment purposes are not considered "persons" amenable to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989).[13] However, individual defendants named in their individual capacity are amenable to suit as "persons" under § 1983 even if they are being sued for what are technically "official

---

[13]    Determining whether a defendant is a "person" under § 1983 is related to but distinct from an Eleventh Amendment analysis. *See Estate of Lagano*, 769 F.3d at 857 (finding that the District Court's analysis "improperly conflates the jurisprudence interpreting the term 'person' in the context of § 1983 with the concept of Eleventh Amendment sovereign immunity. [. . . T]he two concepts are analytically distinct").

acts." *Hafer*, 502 U.S. at 27-28 (holding that, while suits against state officials in their official capacity are "treated as suits against the State," personal capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law.") (internal citations omitted); *see also Evans*, 2016 WL 2742862, at *10 ("[i]ndividuals named as defendants in their personal capacities are amenable to suit as 'persons.' It does not matter that they happen to be government officials, or that the acts for which they are sued happen to be official acts") (internal citations omitted); *Estate of Lagano*, 769 F.3d at 854 n.5 ("Of course, a state official sued in his or her personal capacity is amenable to suit under [§] 1983[.]"). Therefore, Scharfenberg, Malinowski, Billhimer, and Coronato are amenable to suit in their individual capacities.

## 2. Absolute Immunity

Defendants also argue that all claims against them should be dismissed based on absolute immunity. (ECF No. 37-1 at 33.) In *Imbler v. Pachtman*, 424 U.S. 409, 435 (1976), the Supreme Court recognized that absolute immunity applies to prosecutors subject to § 1983 claims, explaining that such protections were "necessary to protect the judicial process." *Id.* at 437. Without absolute immunity, the Court reasoned, the constant threat of litigation could discourage prosecutors from taking necessary action, hampering the pursuit of justice. *Id.* at 425–426.

But absolute immunity is not without limits. *Imbler* dictates that these protections only apply to prosecutorial activities "intimately associated with the judicial phase of the criminal process" and not investigatory actions. *Id.* at 430. The purpose of this distinction is to "leave standing those cases . . . which hold that a prosecutor engaged in certain investigative activities enjoys, not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman." *Id.* However, given the Supreme Court's "quite sparing" recognition of absolute immunity, prosecutors bear a "heavy burden" of establishing entitlement to such protections. *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008) (citing *Burns v. Reed, 500*

U.S. 478, 486–87, (1991)).  Indeed, courts "begin with the presumption that qualified, rather than absolute immunity, is appropriate." *Id*.  This presumption is only overcome when a prosecutor shows that the actions at issue were taken in the role of advocate for the state.  *Id*. at 207–08 (3d Cir. 2008) (finding that to overcome the presumption against absolute immunity, "a prosecutor must show that he or she was functioning as the state's advocate when performing the action(s) in question"); *see also Weimer v. Cnty. of Fayette, Pa.*, 972 F.3d 177, 187 (3d Cir. 2020) ("To earn the protections of absolute immunity at the motion-to-dismiss stage, a defendant must show that the conduct triggering absolute immunity clearly appears on the face of the complaint.") (internal citations and quotations omitted).

Determining when absolute immunity applies is a functional analysis attaching "not to the prosecutor as an individual, but to the nature of the function pursuant to which he acts." *Munchinski v. Soloman*, 747 F. App'x 52, 56 (3d Cir. 2018).  The Third Circuit has explained that absolute immunity applies to any action a prosecutor takes while acting in a "quasi-judicial role." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992).  This includes court appearances in which a prosecutor presents evidence or makes legal arguments, as well as out-of-court behavior "intimately associated with the judicial phases of litigation." *Id*. (internal citations omitted).

While "malfeasance is no proper part of a prosecutor's role . . . the analysis under *Imbler* is different.  Immunity depends on the nature of the function, not the rightful or wrongful manner in which it is performed." *Evans*, 2016 WL 2742862, at *11.  "To give examples of prosecutorial activities protected by absolute . . . immunity, soliciting false testimony from witnesses in grand jury proceedings and probable cause hearings is absolutely protected." *Id*. (quoting *Kulwicki*, 969 F.2d at 1465).  "Use of the false testimony in connection with the prosecution is absolutely

protected." *Id.* "Even interviews generating evidence to be presented to a grand jury are absolutely

protected." *Id.* (quoting *Kulwicki*, 969 F.2d at 1465).

### a.   Scharfenberg

The Complaint alleges that Assistant Prosecutor Scharfenberg engaged in misconduct

during his initiation of a criminal investigation against Plaintiffs and in overseeing the presentation

of evidence to the grand jury. According to the Complaint, Scharfenberg improperly initiated a

criminal investigation against Plaintiffs and personally performed investigative actions typically

handled by investigators. (ECF No. 1 ¶¶ 47-53.) Scharfenberg improperly used information

obtained through these means to undermine Plaintiffs' business operations, ultimately driving them

out of business and interfering with their bankruptcy proceedings. (*See id.* ¶¶ 47-70.) Furthermore,

Plaintiffs allege that the OCPO, under Scharfenberg's direction, made false statements and

concealed exculpatory evidence in its presentation of evidence to the grand jury. (*See id.* ¶¶ 80-

106.) Finally, the Complaint alleges that, under Scharfenberg's direction, the OCPO improperly

included numerous non-victims in the Indictment to "create the appearance of a massive fraud."

(*Id.* ¶ 107.)

Any actions Scharfenberg took in connection with the grand jury proceedings against

Plaintiffs are afforded absolute immunity. Regardless of the "rightful or wrongful manner" in

which the grand jury presentment was conducted, such actions are core to the prosecutorial

advocacy function. *Evans*, 2016 WL 2742862, at *11; *see also Burns*, 500 U.S. at 485 (observing

that in *Imbler*, the Supreme Court extended absolute immunity to "the knowing use of false

testimony before the grand jury"); *Andors v. Gross*, 294 F. App'x 731, 734 (3d Cir. 2008) (finding

that prosecutors were protected by absolute immunity for their presentation to the grand jury).

Similarly, Scharfenberg's alleged withholding of evidence from Plaintiffs during discovery, such

as concealing Scharfenberg's interview of Jeremy Price, Plaintiffs' lawyer, is also related to a prosecutor's advocacy function and is shielded under absolute immunity. *See Yarris v. Cnty. of Delaware*, 465 F.3d 129, 137-138 (3d Cir. 2006) (stating that a decision whether to withhold evidence from the defense is an act involving prosecutorial discretion and therefore is protected by absolute immunity).

Scharfenberg's decision to prosecute Plaintiffs, despite his alleged conflict of interest, is afforded the same result. Absolute immunity "exists primarily to protect the discretion of prosecutors when they act as advocates for the state." *Munchinski v. Solomon*, 747 F. App'x 52, 58 (3d Cir. 2018). This discretion—or lack thereof—underpins whether a prosecutor is acting in the role of an advocate and, thus, protected by absolute immunity regardless of the prosecutor's personal motives. *Kulwicki*, 969 F.2d at 1464. In *Kulwicki v. Dawson*, the Third Circuit held that a county district attorney was immune from suit despite directing a police officer to file baseless charges against the District Attorney's political rival. *Id.* Citing *Imbler*, the *Kulwicki* court reasoned that "[c]onsideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity. . . . The Court has explicitly stated that even groundless charges are protected, in the interest of maintaining vigorous prosecution of crime." *Id.* (citing *Imbler*, 424 U.S. at 424–28). Similarly, in *Evans v. City of Newark*, the court held that absolute immunity protected a county prosecutor's decision to initiate a prosecution motivated by her desire to boost a mayor's political campaign and gain career advancement. 2016 WL 2742862, at *12; *see also Fuchs v. Mercer Cnty.*, 260 F. App'x 472, 475 (3d Cir. 2008) ("Prosecutors enjoy absolute immunity for the decision to initiate a prosecution . . . and even for failure to conduct adequate investigation before filing charges.") Consequently, even if Scharfenberg initiated the

prosecution for the purpose of undermining Plaintiffs' business, that decision is afforded absolute immunity.[14]

All of Scharfenberg's actions, however, "are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). While immunity attaches to actions "intimately associated with the judicial phases of litigation," it does not attach to "administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Odd*, 538 F.3d at 208. The determination of whether a prosecutor is acting as an advocate or in an administrative/investigatory function is a fact-specific inquiry. *See Odd*, 538 F.3d at 210 (noting that while "it is tempting to derive bright-line rules . . . the Supreme Court has cautioned against such categorical reasoning") (citing *Imbler*, 424 U.S. at 431). However, courts have found, for example, that prosecutors are not entitled to absolute immunity when holding press conferences, *Buckley*, 509 U.S. at 276-78, fabricating evidence during a preliminary investigation, *id.*, or deliberately destroying exculpatory evidence. *Yarris*, 465 F.3d at 136-137.

Absolute immunity does not bar claims based on allegations that Scharfenberg engaged in misconduct during the criminal investigation or provided false information to the United States Bankruptcy Trustees. Nor does it apply to the allegedly false statements made to PHG's vendors and customers. According to the Complaint, Scharfenberg engaged in these actions five or more years before the formal commencement of criminal proceedings against Plaintiffs. (*See* ECF No.

---

[14]    Similarly, all federal claims against Coronato and Billhimer are also barred by absolute immunity and are dismissed without prejudice. Plaintiffs' singular allegation as to both Coronato and Billhimer is that they were "well aware of Scharfenberg's ownership and operation of Beacon Homes while he was investigating [Plaintiffs]." (ECF No. 1 ¶ 152.) However, whether Plaintiffs' prosecution was motivated by Scharfenberg's involvement in Beacon Homes has no bearing on the Court's absolute immunity determination. *See Evans*, 2016 WL 2742862, at *12; *Fuchs*, 260 F. App'x at 475. That is, even if Plaintiffs were prosecuted because of Scharfenberg's involvement in Beacon Homes, the decision to prosecute him is afforded absolute immunity.

1 ¶¶ 51-70 (detailing allegations related to the criminal investigation and bankruptcy proceedings, all of which are alleged to have taken place between April 2015 and December 2016), ¶¶ 74-75 (specifying that the grand jury presentment and Indictment occurred in January 2021).)   Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court finds that absolute immunity does not bar such claims. *See Buckley*, 509 U.S. at 273 (denying absolute immunity to prosecutors who allegedly fabricated evidence based on determination that the prosecutors' conduct occurred "well before they could properly claim to be acting as advocates," and stating that such activities are more akin to "the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" than "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial"); *Weimer*, 972 F.3d at 187 ("To earn the protections of absolute immunity at the motion-to-dismiss stage, a defendant must show that the conduct triggering absolute immunity clearly appears on the face of the complaint.") (internal citations and quotations omitted); *Yarris*, 465 F.3d at 138 (finding that because Defendants failed to establish that the alleged fabrication of evidence occurred while prosecuting the case, rather than during the preliminary investigation, it was not afforded absolute immunity at the motion to dismiss stage).

### b.    Malinowski

While there are only two allegations relating to Malinowski, neither are afforded absolute immunity.[15]   Plaintiffs allege, first, that in 2015, Scharfenberg and Malinowski told PHG

---

[15]    While there are other allegations that could potentially involve Malinowski, his involvement in those alleged events is not clear from the face of the Complaint. The Court will not credit impermissible group pleadings that fail to give each Defendant "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also D.W. by Renaud v. N.J. Div. of Child Protection Permanency*, No. 21-15789, 2023 WL 3626266, at *5 (D.N.J. May 24, 2023) (stating that "courts should not consider any group pleadings that cannot reasonably be attached to an individual defendant due to improper vagueness").

customers that the OCPO was investigating PHG for possible criminal violations and instructed customers not to make their contractually mandated payments to PHG. (ECF No. 1 ¶¶ 62-63.) Second, Plaintiffs state that, on September 15, 2016, Malinowski informed a PHG customer, Gail Feliciano, that "PHG as a business, had filed bankruptcy," which Plaintiffs contend was false. (*Id.* ¶ 140.)

Defendants argue that these allegations are subject to absolute immunity, as "investigative work in connection with a criminal prosecution receive [ ] the same absolute immunity as would the prosecutor." (ECF No. 45-2 at 33 (quoting *Iantosca v. Magnone*, Civ. No. 16-9497, 2017 WL 3065214, at *3 (D.N.J. July 19, 2017)). However, for the same reasons detailed above with respect to Scharfenberg's comments to PHG customers and vendors, Defendants have failed to establish that Malinowski undertook these actions as an advocate for the state. Therefore, absolute immunity does not apply to the federal claims against Malinowski.

### 3.   *Heck* Bar

To prove malicious prosecution under § 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing a plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (citation omitted). While any allegations relating to Scharfenberg's initiation of criminal proceedings are barred under absolute immunity,[16]

---

[16]   No allegations concerning Malinowski are relevant to any element of a malicious prosecution claim. (*See* ECF No. 1 ¶¶ 62-63, 140.) Therefore, Count I is dismissed without prejudice against Malinowski insofar as it relates to malicious prosecution. Other § 1983 claims may proceed as discussed *supra* in note 14.

Defendants argue that Plaintiffs' malicious prosecution claim is also barred pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).

*Heck* addresses the element of malicious prosecution requiring a plaintiff to plead a criminal proceeding that ended in their favor, and specifies that a "complaint [alleging a § 1983 malicious prosecution claim] must be dismissed unless the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 87. To prove that a sentence has been invalidated, "a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87.

Defendants argue that Plaintiffs failed to plead a favorable termination of their sentence. (*See* ECF No. 45-2 at 13-14, 36-40.) They further contend that Plaintiffs waived all challenges to the Indictment "and instead sought refuge, through a negotiated plea deal with the State with admission into the State's Pretrial Intervention Program ('PTI'), conditioned upon payment of restitution and compliance with probation and other restrictive conditions." (*Id.* at 14.) In support of this proposition, Defendants attach numerous exhibits including Plaintiffs' PTI Orders of Postponement. (ECF Nos. 45-12 and 45-13.)[17]

Plaintiffs counter that, pursuant to the Supreme Court's decision in *Thompson v. Clark*, 596 U.S. 36 (2022), the completion of PTI is a favorable termination for purposes of a malicious prosecution claim.[18] (ECF No. 46 at 38-40.) In *Thompson*, the Supreme Court determined that

---

[17]    While the Court must generally accept a plaintiff's factual allegations as true, courts may take judicial notice of public records, including court proceedings. *McPherson v. United States*, 392 F. App'x 938 (3d Cir. 2010) (stating that courts may take judicial notice of public records, including court proceedings).

[18]    Plaintiffs cite a New Jersey Appellate Division case, *State v. Lavin*, Civ. No. A-0075-21, 2023 WL 8651317 (N.J. Super. Ct. App. Div. Dec. 14, 2023) in support of this argument. That case is inapposite. While the court in *Lavin* did affirm a finding that PTI was not a "conviction,"

"[t]o demonstrate a favorable termination of a criminal prosecution for purposes of [a] Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Thompson*, 596 U.S. at 39.  The Court disagrees with Plaintiffs' reading of *Thompson* as it ignores established precedent holding that PTI programs do not constitute a favorable termination of a prosecution.  This principle was most recently articulated in *Sexton v. New Jersey Department of Corrections*, which held that while *Thompson* "broadens the scope of scenarios where a litigant can assert a malicious prosecution claim," its reach does not apply to PTI programs.  Civ. No. 21-20404, 2024 WL 4615763, at *15 (D.N.J. Oct. 30, 2024), *aff'd*, Civ. No. 24-3118, 2025 WL 1482788 (3d Cir. May 23, 2025).  Diversionary programs, the court reasoned, give prosecutors broad discretion to divert certain offenders—often those with rehabilitative potential.  *Id.*  While such programs can be "highly punitive," and require "fines or restitution, lengthy periods of probation, the entering of guilty pleas, and other conditions a prosecutor deems appropriate," successful completion allows a defendant to avoid a criminal conviction.  *Id.*  The court explained that "to hold that diversionary programs, such as New Jersey's PTI program, constitute a 'favorable termination' for purposes of malicious prosecution claims would place prosecutors in the untenable position of having to choose between a defendant's rehabilitation and a prosecutor's own civil liability."  *Id.*

Based on the foregoing, Plaintiffs' completion of a PTI program in the instant case does not constitute a favorable termination.  Therefore, their claim for malicious prosecution fails.

---

it did so in an entirely different context that has little relevance when applied to a § 1983 malicious prosecution claim.  *Id.* at *1.  *Lavin* involved a former county employee who bypassed criminal charges by entering a PTI program and agreeing to resign from his position.  *Id.*  Despite successfully completing PTI and seeing all charges dismissed, Lavin sought to vacate his PTI entry based on alleged *Brady/Giglio* violations.  *Id.* at *2.  The Court denied relief, noting that, under the state's post-conviction relief rules, Lavin's claims were not cognizable as he was never convicted.  *Id.* at *5.

Although courts typically dismiss malicious prosecution claims without prejudice in the event that the termination of criminal proceedings later become favorable on appeal, the Court finds that any further amendment would be futile.[19]  *See Williams v. Healy*, Civ. No. 08-2389, 2009 WL 1307239, at *3 (D.N.J. May 5, 2009) (dismissing the plaintiff's malicious prosecution claim with prejudice because any further amendment would be futile since the plaintiff could not show a favorable termination).   Thus, the Court dismisses Plaintiffs' malicious prosecution claim against all Defendants with prejudice.[20]

### C.    Declaratory Judgment Act (Count II)

Plaintiffs bring Count II under 28 U.S.C. § 2201, the Declaratory Judgment Act, asking the Court for an "order declaring that defendants have violated [P]laintiffs' [constitutional] rights." (*See* ECF No. 1 ¶¶ 160-164.)   The Declaratory Judgment Act states, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Declaratory judgement "is inappropriate solely to adjudicate past conduct." *Gruntal & Co. v. Steinberg*, 854 F. Supp. 324, 332 (D.N.J.), *aff'd*, 46 F.3d 1116 (3d Cir. 1994).   Plaintiffs' Complaint centers on past harm, and they have failed to demonstrate the probability of a "feared,

---

[19]    Nothing in the New Jersey Court Rules "allows a defendant to appeal a decision where a prosecutor consented to or recommended enrollment in a PTI program." *See State of New Jersey v. Sexton*, 2024 WL 302880, at *2 (N.J. Super. Ct. App. Div. 2024).

[20]    Defendants argue that qualified immunity also bars Plaintiffs' malicious prosecution claim. Because the Court dismisses the malicious prosecution claim on other grounds, it will not address those arguments here.   Nor will the Court address qualified immunity with respect to a potential Fourteenth Amendment claim as Defendants make no arguments with respect to the doctrine's applicability to such a claim. *See Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) (stating that the defendant bears "[t]he burden of establishing entitlement to qualified immunity").

future event . . . 'of sufficient immediacy and reality to warrant the issue of a declaratory judgment.'" *Pieczenik v. Comm'r N.J. Dep't of Env't Prot.*, 715 F. App'x 205, 208 (3d Cir. 2017) (quoting *Salvation Army v. Dep't of Cmty Aff.*, 919 F.2d 183, 192 (3d Cir. 1990)). Nor is "declaratory judgment meant simply to proclaim that one party is liable to another." *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006).

The Court also notes that the declaration sought by Plaintiffs is duplicative of Plaintiffs' § 1983 claims. Both require a finding that Defendants subjected Plaintiffs to the "deprivation of . . . rights, privileges and immunities secured by the Constitution and laws." (*See* ECF No. 1 ¶¶ 157, 164.) If Plaintiffs prevail on their § 1983 claims, "then an *actual judgment*, rather than a mere declaration, would be entered," entitling Plaintiffs to relief. *Cf. Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 504–05 (D.N.J. 2009) (dismissing the plaintiffs' New Jersey Consumer Fraud Act claim as duplicative of their declaratory judgment claim). Therefore, "unless Plaintiffs identify a basis in [§ 1983] whereby the Court must grant declaratory relief as a prerequisite for a finding of liability, the Court need not issue a separate declaratory judgment on the merits of the action." *Id.* at 505. Therefore, Plaintiffs' declaratory judgment claim is dismissed.

### D.    State Law Claims (Counts III – VI)

In addition to Plaintiffs' federal claims, Plaintiffs bring four state law claims: (1) tortious interference with contractual relations against Scharfenberg and Beacon Homes (Count III); (2) tortious interference with prospective economic advantage against Scharfenberg and Beacon Homes (Count IV); (3) defamation against advantage against Scharfenberg and Beacon Homes (Count V); and (4) civil conspiracy against all Defendants (Count VI).

Defendants argue that Plaintiffs have failed to adhere to the New Jersey Tort Claims Act's (NJTCA) notice requirements. (*See* ECF Nos. 45-2 at 45-46, 50 at 19-20.) The NJTCA provides that, prior to bringing a tort claim against a public official or entity, a plaintiff must give notice to

the public entity within 90 days of the accrual of the cause of action. *See* N.J. Stat. Ann. § 59:8-8. Otherwise, the plaintiff is "forever barred from recovering against a public entity or public employee[.]" N.J. Stat. Ann. § 59:8-8(a). This "notice requirement is a 'jurisdictional precondition[21] to filing suit, . . . and suits that do not comply with the notice provision are 'forever barred from recovering against a public entity or public employee.'" *Helms v. Miller*, Civ. No. 22-01325, 2024 WL 4972710, at *5 (D.N.J. Dec. 3, 2024) (quoting *Ptaszynski v. Uwaneme*, 853 A.2d 288, 294 (N.J. Super. Ct. App. Div. 2004); N.J. Stat. Ann. § 59:8-8). Furthermore, Plaintiffs bear the burden of proving that the claim was filed with the proper public entity. *Rolax*, 175 F. Supp. 2d at 729 (granting the defendants' motion to dismiss for failure to state a claim).

Here, Plaintiffs have neither alleged any facts to suggest that Defendants were provided notice, nor have they responded to Defendants' arguments regarding their lack of compliance with the NJTCA notice requirements. Accordingly, Plaintiffs' state law claims are dismissed as to all Defendants. *See Baldeo v. City of Paterson*, Civ. No. 18-5359, 2019 WL 277600, at *1 (D.N.J. Jan. 18, 2019) ("[T]he Complaint's tort claims are dismissed in their entirety . . . because the plaintiffs have failed to file a notice of tort claim under the New Jersey Tort Claims Act.").[22]

### E.    Standing

Defendants argue that because PHG no longer exists as a legal entity, its claims should be dismissed under Rule 12(b)(1) for lack of standing. (ECF No. 45-2 at 50-52.) In 2018, PHG's Certificate of Formation was permanently cancelled by the Superior Court New Jersey. (*See* ECF

---

[21]    Because the NJTCA's notice requirement is jurisdictional, the Court may consider facts outside of the Complaint in assessing Plaintiffs' compliance with that requirement under Rule 12(b)(1). *See Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006).

[22]    Defendants also argue that the tort claims should be dismissed based on the NJTCA's qualified immunity provision, and that the defamation claim is time barred. Because the Court dismisses these claims on other grounds, it does not reach these arguments.

No. 45-6 at 5 ("IT IS FURTHER ORDERED that the Certificate of Formation in the state of Price Home Group is permanently cancelled, as authorized by the CFA, N.J.S.A. 56:8-8.").) Defendants contend that New Jersey law requires a limited liability company to obtain a Certificate of Formation to confer legal existence. (ECF No. 45-2 at 51-52 (citing N.J.S.A. 42:2C-18(d).) Without legal existence, Defendants argue, "PHG cannot bring or maintain an action in any court." (ECF No. 45-2 at 51.)

The Court agrees. Under New Jersey law, once a company's certificate of formation is terminated, it is no longer a legal entity capable of suing or being sued. *See Est. of Dotson through Douglas v. Viewpoint Leasing Inc.*, Civ. No. 24-255, 2024 WL 4880403, at *1, n.1 (D.N.J. Nov. 25, 2024) ("Gray's Truck Repair [a named defendant] is not an entity capable of suing or being sued because the LLC is no longer in existence. Gray's Truck Repair's existence was officially terminated on March 27, 2013. As such . . . all claims against them will be dismissed with prejudice."); *Int'l Union of Operating Engineers, Loc. 68, AFL-CIO v. RAC Atl. City Holdings, LLC*, Civ. No. 11-3932, 2013 WL 353211, at *9 (D.N.J. Jan. 29, 2013) ("As a basic matter, New Jersey's LLC Act does not allow cancelled entities to be served, prosecute or defend suit. . . . [O]nce a limited liability company's certificate of formation is canceled, it no longer exists as a separate legal entity for any purpose."). Accordingly, all of PHG's claims are dismissed with prejudice.

## IV.     CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss

(ECF No. 45-2) is **GRANTED in part** and **DENIED in part**. An appropriate Order follows.


Dated: August 4, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE